IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

MATTHEW P. MICHEL,

         Petitioner,                No. CIV S-02-2230 MCE CMK P

    vs.

GEORGE M. GALAZA, Warden,

         Respondent.         <u>FINDINGS AND RECOMMENDATIONS</u>

_____/

        Petitioner is a state prisoner proceeding pro se with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner and co-defendants Michael Brown III, John Franklin Taylor, and Enrique "Rick" Carrillo, were charged with murder and attempted murder.  It was further alleged as to each count that petitioner personally used a firearm in the commission of the offense and that he caused great bodily injury.  Two juries sat on the case; one jury for defendants Brown, Taylor and Carrillo and a second jury for petitioner.

        In his second amended petition, petitioner challenges his 1999 conviction on first-degree murder, attempted murder, use of a firearm, and infliction of great bodily injury and the sentence of forty-five years to life.  Petitioner claims that the evidence was insufficient to support his conviction for first-degree murder; he claims that his constitutional rights were violated by the trial court admitting evidence of petitioner's allegedly involuntary statement to police, by the trial court failing to take precautionary measures to prevent the jury from viewing

1    and reading co-defendant Taylor's unredacted pretrial statement; and by the trial court

2    instructing the jury on the uncharged crime of conspiracy.  Petitioner also alleges that he

3    received ineffective assistance of counsel.

4    I.    Background

5              Petitioner's crime occurred after a baptism and subsequent alcohol laden

6    celebration party.[1]  On May 24, 1997, the grandchild of Virginia "Virgie" Nuno was to be

7    baptized and a celebration party was to be held afterwards.  Approximately seventy-five people

8    attended the post-baptism celebration at Cabrillo Hall and many people were socializing,

9    dancing, and drinking.

10              After the celebration at Cabrillo Hall, many of the party-goers continued their

11   celebration at Yolanda's Lounge.  Among them was petitioner, Rick Carrillo, Jr., John Franklin

12   Taylor, Robert Swafford and his then-girlfriend-now-wife Rena Tabarez Swafford, Chris

13   Guerrero, Michael Brown III, and Virgie Nuno.   The partying at Yolanda's Lounge ended when

14   Rena got into a fight with a woman who had wanted to talk and dance with Swafford.  Virgie,

15   who is Rena's mother, and Rena's half-sister Maria got into a fight with one of the woman's

16   sisters.  Ultimately, Robert and Chris left the Lounge with Rena and Virgie to take Virgie to her

17   home.  While all four had been drinking, Virgie was the most intoxicated, so the plan was to take

18   her home, and the other three would continue on to Rena's house and spend the night there.

19              As Robert drove to Virgie's house, Rena was yelling at him; angry about the

20   other woman and angry that Robert had broken up Rena's fight with her.  Robert began arguing

21   with Rena, yelled something to the effect that he would show her how much he cared about her,

22   and made an abrupt and illegal U-turn, driving over the middle divider and back towards

23   Yolanda's Lounge.  As Robert drove toward Yolanda's, Rick, who was heading the direction

24   _____

25        [1]For a more detailed discussion of the facts see the opinion of the California Court of
     Appeal for the Third Appellate District in People v. Brown, III et al., No. 9A1999DA103 (March
26   6, 2001), a copy of which is attached as exhibit E to Respondent's Motion to Dismiss. (Doc. 8.)

that Robert had been going before the U-turn, pulled his car to the side of Robert's and yelled "pull over."  In Rick's car were petitioner and John Taylor.   When Rena saw Rick pull up, she told Robert to apologize to Rick, petitioner and John, and then Rena apologized to Robert.  Rena urged Robert to turn back towards her mother's house.  Robert made a second U-turn, drove to Virgie's house, and pulled up in front of her residence, parking on the wrong side of the street.

At Virgie's house, Rena got out of the car and began trying to pull her mother out of the backseat.  As Rena did so, Rick came up and also tried to help Virgie out of the car.  Rena then became aware that Rick had parked his car across the street from and to the rear of Robert's car.  Rena also realized that Rick was angry with Robert, apparently for driving so recklessly with Virgie in the car.[2]  Rick was yelling and cursing at Robert.   Rena was also aware that another car, which she later learned was her half-sister Maria's car, had pulled up behind Robert's car.  Michael Brown and another man were in Maria's car.

Angered by Rick's yelling, Robert got out of the car and walked to the rear passenger side.  He had taken his shirt off.  After helping Virgie out of the car, Rick went to the rear passenger side and argued with Robert; the two men appeared to be getting ready to fight.  Rena got between the two men, asking them not to fight.

As Rena pushed Rick and he backed up, petitioner approached from behind with a gun and started shooting.  As petitioner continued to approach, Rena ran forward to get away and ducked behind a fence, where she heard several gunshots.

Meanwhile, Robert saw two shadows emerge from Rick's car as Rena was attempting to prevent him from fighting with Rick.  Shots rang out and Robert remembers getting hit twice in the body, then ducking into the backseat of his car for cover.  After he had gotten into his car, he saw petitioner walk from the front of the car to the passenger side, pull forward the back seat, point the gun at him and fire several times.  Robert also heard other

---

[2]Rick's close relationship with Virgie led him to refer to her as his mother.

1  gunfire, but he did not know from where it was coming.

2  　　　　After the shooting ended, Rena heard someone say "let's get out of here."  She

3  heard two cars drive away—Rick's and Maria's.  She ran over to Robert begging him not to die.

4  Chris Guerro had also been shot.  During her second interview with police, Rena admitted that

5  she had mislead them in her first interview because she was afraid and did not believe the police

6  could protect her.  During her second interview, Rena told police that she had seen Michael

7  Brown shooting a gun at Chris Guerrero.  At trial, Rena testified that she did not actually see

8  Michael that night.  Because Rena's trial testimony was inconsistent with her prior interview, a

9  redacted videotape of her second interview was played for both juries and a transcript of

10  redacted interview was given to petitioner's jury.[3]

11  　　　　The police arrived at the scene and Robert and Chris were transported to the

12  hospital.  All totaled, Robert was found to have suffered eight gunshot wounds, but he survived

13  his injuries.  Chris was found to have suffered three gunshot wounds and died from his injuries.

14  II.　　Standards for Granting Habeas Relief

15  　　　　　　An application for a writ of habeas corpus by a person in custody under a

16  judgment of a state court can be granted only for violations of the Constitution or laws of the

17  United States. See 28 U.S.C. § 2254(a). Federal habeas corpus relief also is not available for any

18  claim decided on the merits in state court proceedings unless the state court's adjudication of the

19  claim:

20  　　　(1) resulted in a decision that was contrary to, or involved an unreasonable
　　　application of, clearly established federal law, as determined by the Supreme Court
21  　　　of the United States; or

22  　　　(2) resulted in a decision that was based on an unreasonable determination of the
　　　facts in light of the evidence presented in the State court proceeding.
23

See 28 U.S.C. § 2254(d) (referenced herein in as " § 2254(d)" or "AEDPA"). See Ramirez v.
24

25  _____

26  　　　[3]As noted above, petitioner was tried with his co-defendants Brown, Taylor and Carrillo,
but a separate jury was impaneled for petitioner.

4

1   Castro, 365 F.3d 755, 773-75 (9th Cir.2004) (Ninth Circuit affirmed lower court's grant of habeas

2   relief under 28 U.S.C. § 2254 after determining that petitioner was in custody in violation of his

3   Eighth Amendment rights and that § 2254(d) does not preclude relief); see also Lockyer v.

4   Andrade, 538 U.S. 63, 70-71 (2003) (Supreme Court found relief precluded under § 2254(d) and

5   therefore did not address the merits of petitioner's Eighth Amendment claim).  Courts are not

6   required to address the merits of a particular claim, but may simply deny a habeas application on

7   the ground that relief is precluded by 28 U.S.C. § 2254(d). See Lockyer, 538 U.S. at 71

8   (overruling Van Tran v. Lindsey, 212 F.3d 1143, 1154-55 (9th Cir.2000) in which the Ninth

9   Circuit required district courts to review state court decisions for error before determining

10  whether relief is precluded by § 2254(d)).  It is the habeas petitioner's burden to show he is not

11  precluded from obtaining relief by § 2254(d). See Woodford v. Visciotti, 537 U.S. 19, 25 (2002).

12          The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) are

13  different. As the Supreme Court has explained:

14          A federal habeas court may issue the writ under the "contrary to" clause if the state
            court applies a rule different from the governing law set forth in our cases, or if it
15          decides a case differently than we have done on a set of materially
            indistinguishable facts. The court may grant relief under the "unreasonable
16          application" clause if the state court correctly identifies the governing legal
            principle from our decisions but unreasonably applies it to the facts of the
17          particular case. The focus of the latter inquiry is on whether the state court's
            application of clearly established federal law is objectively unreasonable, and we
18          stressed in Williams v. Taylor, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389
            (2000)  that an unreasonable application is different from an incorrect one.
19

20  Bell v. Cone, 535 U.S. 685, 694 (2002). A state court does not apply a rule different from the law

21  set forth in Supreme Court cases, or unreasonably apply such law, if the state court simply fails to

22  cite or fails to indicate an awareness of federal law. See Early v. Packer, 537 U.S. 3, 8 (2002).

23          The court will look to the last reasoned state court decision in determining whether

24  the law applied to a particular claim by the state courts was contrary to the law set forth in the

25  cases of the United States Supreme Court or whether an unreasonable application of such law has

26  occurred. See Avila v. Galaza, 297 F.3d 911, 918 (9th Cir.2002), cert. dismissed,538 U.S. 919

1  (2003).  Where the state court fails to give any reasoning whatsoever in support of the denial of a

2  claim arising under Constitutional or federal law, the Ninth Circuit has held that this court must

3  perform an independent review of the record to ascertain whether the state court decision was

4  objectively unreasonable.  See Himes v. Thompson, 336 F.3d 848, 853 (9th Cir.2003).  In other

5  words, the court assumes the state court applied the correct law, and analyzes whether the

6  decision of the state court was based on an objectively unreasonable application of that law.  It is

7  appropriate to look to lower federal court decisions to determine what law has been "clearly

8  established" by the Supreme Court and the reasonableness of a particular application of that law.

9  See Duhaime v. Ducharme, 200 F.3d 597, 598 (9th Cir.1999).

10  III.    Arguments and Analysis

11       A.    Insufficient Evidence

12            Petitioner claims that his rights under the Fifth and Fourteenth Amendments of the

13  United States Constitution were violated because the evidence was insufficient to support his

14  first-degree murder and his attempted murder convictions.   In order to prevail on a claim of

15  insufficiency of the evidence, a petitioner must show that no rational trier of fact could have

16  found the essential elements of the crime charged beyond a reasonable doubt.  See Jackson

17  v.Virginia, 443 U.S. 307, 319 (1979); Windham v. Merkle, 163 F.3d 1092, 1101 (9th Cir. 1998).

18  A reviewing court must consider the evidence as a whole and in a light most favorable to the

19  prosecution.  See Jackson, 443 U.S. at 319.  If the record supports conflicting inferences, it must

20  be presumed that the trier of fact resolved any conflicts in favor of the prosecution, and a

21  reviewing court must defer to that resolution.  See id.; Payne v. Borg, 982 F.2d 335, 338 (9th Cir.

22  1992).   The standard in California state courts for reviewing sufficiency of evidence claims is the

23  same as that set forth in Jackson; People v. Johnson, 26 Cal.3d 557, 578-579 (1980).

24  ///

25  ///

26  ///

1          The last reasoned decision on this claim was the decision of the California Court of

2   Appeal for the Third Appellate District on petitioner's direct appeal.[4]   The Court of appeal

3   applied the <u>Jackson</u> standard in denying petitioner's claim:

4          Because there was no evidence from which the jury could determine that
       Michel fired the factual bullet, the jury would necessarily have had to find Michel
5      guilty of murder on a theory of aiding and abetting or conspiracy as the prosecutor
       argued.  We therefore review the evidence to determine whether Michel aided and
6      abetted a first degree murder.

7          In making this determination we first review the evidence to determine
       whether there is substantial evidence to support the jury's finding the perpetrator
       of the murder committed first degree murder.  We then review the evidence to
8      determine whether there is substantial evidence Michel aided and abetted that first
       degree murder.
9      . . . .

10         By Michel's own admission, he was motived to kill [Robert] Swafford
       because of the confrontation he and Swafford had a few weeks earlier at Folsom
11     Lake where, in Michel's own words, Swafford tried to "bully" him.  He told
       Detective Winton "that shit made me hella mad, dude...I emptied my clip."  The
12     jury could reasonably conclude Michel decided to shoot Swafford out of anger and
       revenge arising out of their recent confrontation at Folsom Lake.  Moreover, given
13     his close relationship with the three defendants, and the events that lead up to the
       shooting, the jury could conclude that Michel had communicated his motive to kill
14     Swafford to his confederates, and for that reason, they planned to shoot and kill
       Swafford.

15         We find planning activity is established by evidence Michel had a
       close relationship to the other defendants, they had spent the evening together, and
16     afterwards followed Swafford to [Vergie] Nuno's residence in two cars.  Although
       defendants had spent the evening socializing with the members of Swafford's
17     party, and without a hint of violence between them, they nevertheless were armed
       with at least four weapons when they left Yolanda's Lounge and drove to the scene
       of the shootings.  Michel knew they were all armed and, as discussed above, the
18     other defendants knew of Michel's animosity towards Swafford and had reason to
       believe Michel planned to kill Swafford.

19         Further evidence of planning can be inferred from [Rick] Carrillo's
       conduct.  He parked the car, and went over to Swafford's car to urge Nuno, whom
20     he called "mom," to get out of the car to a place of safety, raising the inference that
       Carrillo, as one of the confederates, knew of the impending violence.  Pursuant to
21     their plan, once Nuno was out of harm's way, Michel exited Carrillo's car and
       began firing his .380 firearm at Swafford, joined by Brown and Taylor.

22         The manner of killing also supports a finding defendants Michel, Brown,
       and Taylor planned and intended to kill Swafford.  Michel shot at Swafford while
23     he was standing beside the car and continued to shoot at him when Swafford
       retracted to the car, emptying his clip into Swafford.  Michel told the detective he
24     was "shooting directly at him [Swafford]....I don't know how I missed.  I don't see

25   _____

26         [4]The California Supreme Court denied this claim without comment or citation. (Answer,
     Ex. A.)

1    how I could." Swafford was shot eight times by bullets from at least three
     different weapons. As previously stated, 19 shots were fired into the Cadillac
2    where Swafford and Guerrero were located.
           The evidence also established Michel aided and abetted the attempted
3    murder of Swafford. Because the motive to kill Swafford originated with Michel,
     the jury could find Michel instigated the plan to shoot Swafford, and therefore he
4    had knowledge of his confederates' intent to shoot Swafford, that he shared their
     intent, and promoted and encouraged the target offense by shooting Swafford
5    numerous times with the intent to kill him.
           Having assisted and encouraged his confederates to commit the attempted
6    murder of Swafford (the target offense), Michel is also liable for the natural and
     probable consequences of that offense which include the first degree murder of
7    Guerrero. The evidence established that one of the three defendants shot and
     killed Guerrero as a consequence of the attempted murder of Swafford by shooting
8    into the car occupied by Swafford and Guerrero, and therefore one of the
     defendants was the perpetrator of that offense while the other two defendants aided
9    and abetted the perpetrator.
           The jury was instructed on the doctrine of transferred intent, that "[w]hen
10   one attempts to kill a certain person, but by mistake or inadvertence, kills different
     person, the crime....so committed is the same as though the person originally
11   intended to be killed had been killed. If it was Michel's bullet that killed Guerrero
     the doctrine directly applies to him. If the bullet came from the gun of another
12   defendant, that defendant is guilty of first degree murder on the theory of
     transferred intent and Michel is guilty of the same offense because the offense was
13   the natural and probable consequence of the Swafford shooting which Michel
     aided and abetted.

14

15   (Motion to Dismiss (doc. 8), Ex. E, People v. Brown III, slip op. at 55-58 (internal citations

16   omitted.))

17          The state court concluded that a rational trier of fact could have found the essential

18   elements of the crimes charged beyond a reasonable doubt.   After careful review of the record

19   herein, the court finds that the state court's determination of the facts was entirely reasonable, and

20   that its rejection of this claim was neither contrary to nor an unreasonable application of

21   controlling principles of federal law.  For example, more than nineteen shots were directed at

22   Robert Swafford's car. (RT 1084.)  The ballistics analysis established that at least four weapons

23   were involved; a nine- millimeter Luger, a .38 Special or .357 Magnum, a .380 and a ten-

24   millimeter. (RT 1042-1047.)  Although the bullet that killed Guerrero was not identified,

25   ballistics evidence established that Swafford was hit by at least three of the four weapons; the

26   nine-millimeter, the .380, and the .38 Special pr .357 Magnum. (RT 1074.)  Petitioner conceded

8

1   that he used a .380 caliber firearm at the time of the shooting.  (CT 1166-1167.)  None of the

2   shots from the same caliber weapons were on parallel tracks, indicating that each gun was shot by

3   a separate gunman.  (RT 1696.)

4          In his traverse, petitioner argues that his decision to shoot "came on the heels of

5   [Robert] Swafford attempting to fight his friend Rick Carrillo and [hitting] Maria Aguliar.

6   Petitioner adamantly asserts that it was precisely at this point in time that his ill-feelings

7   concerning Swafford that stemmed from the Folsom incident coupled with [hitting Maria] that

8   played the decisive role in petitioner's decision to pull his .380 pistol...and advance towards

9   [Swafford]."  (Traverse (doc. 50) at 34-35.)  Petitioner also alleges that he did not intend to kill

10  Swafford, but instead intended only to hurt him.  (Traverse (doc. 50) at 37.)

11         Petitioner's allegations in his traverse do not, however, erase the fact that the

12  record reflects that a rational trier of fact could have found the essential elements of the crimes

13  charged beyond a reasonable doubt.  Even if the record supports conflicting inferences, it must be

14  presumed that the trier of fact resolved any conflicts in favor of the prosecution, and a reviewing

15  court must defer to that resolution.  See Jackson, 443 U.S. at 319.  Based on the foregoing, the

16  court recommends that petitioner's first claim be denied.

17         B.      Erroneously Admitted Evidence

18         Petitioner argues that his rights under the Fifth, Sixth, and Fourteenth

19  Amendments of the United States Constitution were violated when the trial court erroneously

20  admitted into evidence his asserted involuntary statement to police.  Respondent contends that

21  this claim is subject to procedural default.

22         Based on concerns of comity and federalism, federal courts will not review a

23  habeas petitioner's claims if the state court decision denying relief rests on a state law ground that

24  is independent of federal law and adequate to support the judgment.  See  Coleman v. Thompson,

25  501 U.S. 722 (1991); Harris v. Reed, 489 U.S. 255, 260-62 (1989).  Generally, the only state law

26  grounds meeting these requirements are state procedural rules.  If there is an independent and

9

1  adequate state ground for the decision, the federal court may still consider the claim if the

2  petitioner can demonstrate:  (1) cause for the default and actual prejudice resulting from the

3  alleged violation of federal law, or (2) a fundamental miscarriage of justice.  See Harris, 489 U.S.

4  at 262 (citing Murray v. Carrier, 477 U.S. 478, 485, 495 (1986)).

5          "For a state procedural rule to be 'independent,' the state law basis for the decision

6  must not be interwoven with federal law."  Bennett v. Mueller, 322 F.3d 573, 581 (9th Cir. 2003)

7  (internal citations omitted).  A state law is so interwoven if the state has made the application of

8  the procedural bar depend on an antecedent ruling on federal law; for example if the state

9  procedural bar is dependant on whether a federal constitutional error was committed, the

10  procedural bar is not independent.  See Park v. California, 202 F.3d 1146, 1152 (9th Cir. 2000).

11          The independent and adequate ground doctrine prohibits federal habeas review when the

12  state court declined to address a petitioner's federal claim because the petitioner failed to meet

13  state procedural requirements.  See Correll v. Stewart, 137 F.3d 1404, 1417 (9th Cir. 1998).  For

14  purposes of determining whether a habeas claim is properly barred by procedural default, an

15  unexplained decision of the state supreme court denying review of the trial court's denial, is

16  presumed to rest on the same state-law procedural basis.  See id.

17          The last reasoned decision on this claim was the decision of the California Court of

18  Appeal for the Third Appellate District on petitioner's direct appeal.[5]  The Court of Appeal

19  rejected this claim, stating:

20          Defendant Michel contends his convictions must be reversed because the
        trial court erroneously admitted evidence of his involuntary statements to police.

21          He argues these statements were involuntary because they were the product of
        psychological coercion.  The People contend defendant waived this claim on

22          appeal because he failed to raise it below.

23          Michel filed a written motion to suppress all statements he made that were
        obtained in violation of his constitutional rights, including his rights under

24          Miranda v. Arizona, (1966) 384 U.S. 436 [16 L.Ed.2d 694].  The motion contained

25  ────────────────

26          [5]The California Supreme Court denied this claim without comment or citation. (Answer,
    Ex. A.)

no analysis, no specific citations to his interview, no specific allegations of impropriety during the interview, and he did not request an evidentiary hearing. At the hearing on the motion, the People presented evidence regarding the interview, the advisements of Michel's constitutional rights, and his waiver of those rights. The defense did not call any witnesses, although counsel cross-examined Detective Winton about the advisement and waiver of rights. During oral argument, counsel only argued that Michel had not made an effective waiver of his <u>Miranda</u> rights.

Under these circumstances, we find Michel failed to raise a timely and specific claim in the trial court this his statement was involuntary because it was the product of psychological coercion. He has therefore waived that claim on appeal.

(Motion to Dismiss (doc. 8), Ex. E, <u>People v. Brown III</u>, slip op. at 15-16 (internal citations omitted.))

The Court of Appeal's determination that petitioner had waived his claim that his statements were involuntary, and therefore erroneously admitted, clearly rests on a state procedural ground. California courts have consistently applied the contemporaneous objection rule. See <u>Melendez v. Pliler</u>, 288 F.3d 1120, 1125 (9th Cir. 2002); <u>see also</u>, <u>Vansickel v. White</u>, 166 F.3d at 957-958 (9th Cir. 1999)(recognizing and applying the contemporaneous objection rule in affirming denial of a federal habeas petition based on procedural default). It is presumed that the Supreme Court's denial of petitioner's habeas claim rested on the same grounds. See <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803 (1991); <u>Correll</u>, 137 F.3d at 1417. Accordingly, the court finds that petitioner's second claim is barred by the doctrine of procedural default.

Because petitioner's claim is procedurally defaulted, this court may only consider his claim if he can demonstrate: (1) cause for the default and actual prejudice resulting from the alleged violation of federal law, or (2) a fundamental miscarriage of justice will result if the federal court does not consider his claim. See <u>Harris</u>, 489 U.S. at 262 (citing <u>Murray v. Carrier</u>, 477 U.S. 478, 485, 495 (1986)). Petitioner may show cause by demonstrating "some objective external factor to the defense impeded counsel's efforts" to raise the claim in state court. See <u>Murray v. Carrier</u>, 477 U.S. 478, 488 (1986). Objective factors include interference by state officials that make compliance with the state's procedural rule impractical or a showing that the

1 factual or legal basis for the claim was not readily available.  See id.  Ineffective assistance of

2 counsel may be cause, but attorney error short of ineffective assistance of counsel does not

3 constitute cause.  See id. at 492.  Here, petitioner cannot show cause for the default.  He does not

4 argue that his trial counsel was ineffective for failing to object to the admission of his statement

5 on the grounds that it was coerced or involuntary.  He cannot show that interference made

6 compliance with the state procedural rule impractical.  Finally,  he cannot demonstrate that the

7 legal basis for this claim was not readily available.

8       Similarly, petitioner has failed to demonstrate that failure to consider this claim

9 will result in a fundamental miscarriage of justice.  Petitioner claims that the police detective used

10 "psychological coercion, through the utilization of sleep deprivation" to elicit a confession.

11 Petitioner also asserts that this coercion, combined with his young age of sixteen, made his

12 confession involuntary.  The totality of the circumstances must be considered when determining

13 whether an interview is coercive.  See Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973)  A

14 careful review of the record reveals that, when considered as a whole, the interview was not

15 unduly coercive.

16       For the aforementioned reasons, the court finds that petitioner's second claim is

17 barred by the doctrine of procedural default and recommends that it be denied.

18     C.    Jury Exposure to Inadmissable Evidence

19       Petitioner asserts that his rights under the Fifth, Sixth, and Fourteenth

20 Amendments were violated when the trial court allegedly allowed petitioner's jury to view and

21 read an unredacted pretrial statement made by his co-defendant John Taylor.[6]  Petitioner claims

22 that the trial court's failure to prevent his jury from viewing and reading the unredacted

23

24

25

26    [6]As previously noted, petitioner was tried with his co-defendants; however, the case was
heard by two juries—one for petitioner and one for defendants Brown, Taylor and Carrillo.

1  statements resulted in a violation of <u>Bruton v. United States</u>, 391 U.S. 123 (1968).[7]  The

2  California Supreme Court rejected this claim without comment or citation.  (Answer, Ex. A.)

3          Respondent contends that petitioner has failed to establish a claim of error on this

4  basis; petitioner's bare assertion that the jury in his case was exposed to inadmissible evidence is

5  insufficient.  In his traverse, petitioner contends that it can be reasonably established that

6  petitioner's jury was in possession of co-defendant John Taylor's unredacted pretrial statement by

7  the following.   John Taylor's defense hinged on the actions of his brother Matt Michel

8  (petitioner); The jury for petitioner was excluded from hearing the statement of John Taylor;

9  accordingly, there was no need to delete any of Taylor's references to petitioner.  (Traverse at

10  75.)  Both the Taylor, Brown and Cerrillo jury and petitioner's jury began deliberations on the

11  same day, but the Taylor, Brown and Cerrillo jury began deliberating first.  (Traverse at 77.)  The

12  record shows that the Taylor, Brown and Cerrillo jury requested a copy of the transcript and video

13  tape of John Taylor's pretrial statement.  (Traverse at 77.)  After instructing petitioner's jury, but

14  before they began deliberations, the trial judge stated that the Taylor, Brown and Cerrillo jury had

15  already started to deliberate and that he would direct the bailiff to gather the evidence from the

16  first jury and deliver it to petitioner's jury.  (Traverse at 77.)  The trial judge informed petitioner's

17  jury that they would have to share evidence with the other jury.  (Traverse 77.)  The record shows

18  that petitioner's jury immediately requested a television, V.C.R., list of exhibits, and the

19  transcripts of <u>petitioner's</u> pretrial interview with Detective Winton.  (Traverse 77.)  Petitioner

20  concludes that, because his jury requested a television and V.C.R. and then requested only a

21  transcript of petitioner's pretrial interview, not a recording, that the only logical conclusion is that

22  his jury needed a television and V.C.R. to watch the recorded pretrial interview of John Taylor.

23  (Traverse 77.)  Petitioner argues that the only other explanation for his jury requesting a

24  

25      [7]Under <u>Bruton</u>, a defendant's right of cross-examination secured by the confrontation clause of the Sixth Amendment, is violated by the admission of a non-testifying co-defendant's confession implicating the defendant, even if the jury is instructed to disregard the confession in

26  determining the defendant's guilt or innocence.

1   television and V.C.R. was because "one or two of the jurors brought their own home videos to

2   share with other jurors during a break in deliberations." (Traverse at 77.)  Petitioner claims that

3   the fact that the jury found him guilty on the first day of deliberations (December 3, 1998) and

4   returned a verdict on all the charges on (December 7, 1998) also lends credence to his claim that

5   his jury improperly viewed his co-defendant's unredacted statement.  (Traverse at 77-78.)

6          Nothing in the record indicates that Mr. Taylor's statement was provided to

7   petitioner's jury.   In short, petitioner has provided no support, beyond pure speculation, for his

8   claim that his jury viewed Mr. Taylor's recorded pretrial statement.  This claim does not satisfy

9   28 U.S.C. § 2254(d).   The court cannot find that the California Supreme Court's denial of this

10  claim was contrary to or involved an unreasonable application of clearly established federal law

11  or was unreasonable in light of the evidence presented in the state court proceeding.  See e.g.,

12  Jeffers v. Lewis, 38 F.3d 411, 415 (9th Cir. 1994) (stating that a federal court must presume that

13  the state court applied the proper standard in evaluating the fact, even on a silent record).

14  Accordingly, the court recommends that this claim be denied.

15          D.    Jury Instructional Error

16          Petitioner asserts that his Fifth, and Sixth Amendment rights[8] under the United

17  States Constitution were violated when the trial judge instructed the jury on the uncharged crime

18  of conspiracy which was not supported by the evidence.  Petitioner contends that the conspiracy

19  instruction directly contributed to his counsel's flawed closing argument, which focused on the

20  theory of conspiracy and, in effect, advocated for the prosecution.  Petitioner further argues that

21  the conspiracy instruction relieved the jury of the necessity of finding premeditation and

22  deliberation—the essential elements of first-degree murder.  The California State Supreme Court

23

24  _____

25          [8]In his petition, petitioner also asserted a violation of his Fourteenth Amendment rights,
    but, in his traverse, petitioner concedes that he does not state a cognizable claim under the
26  Fourteenth Amendment.  (Traverse at 83-84.)

1   denied this claim without citation or comment.[9]  (Answer, Ex. A.)

2         Federal habeas courts do not grant relief, as might a state appellate court, simply

3   because a jury instruction may have been deficient.  The only question for a federal court is

4   whether the allegedly ailing instruction by itself so infected the entire trial that the resulting

5   conviction violates due process.  See Donnelly v. DeChristoforo, 416 U.S. 637, 72-73 (1974);

6   Estelle v. McGuire, 502 U.S. 62, 72-73 (1991).  The instruction may not be judged in artificial

7   isolation, but must be considered in the context of the instructions as a whole and the trial record.

8   See Estelle, 502 U.S. at 72.  In other words, the court must evaluate jury instructions in the

9   context of the overall charge to the jury as a component of the entire trial process.  See United

10  States v. Frady, 456 U.S. 152, 169 (1982).

11        In the present case, petitioner has not shown that the ailing instruction by itself so

12  infected the entire trial that the resulting conviction violated his right to due process.  Petitioner

13  was charged with attempted murder and first-degree murder.  He was not charged with

14  conspiracy; conspiracy was one of the theories upon which the prosecution relied to establish the

15  liability of each of the defendants (Brown, Cerrillo, Taylor, and Petitioner), and the jury was

16  instructed to that effect.  The jury was not instructed, however, that it could find petitioner guilty

17  of either murder or attempted murder based on a theory of conspiracy to commit murder.  To the

18  contrary, the jury was properly instructed that the offenses of first-degree murder and attempted

19  murder required an express intent to kill.  See e.g., Evanchyk v. Stewart, 340 F.3d 943, 939 (9th

20  Cir. 2003) ("[W]hen a trial judge omits an element of the offense charged from the jury

21  instructions, it deprives the jury of its fact-finding duty and violates the defendant's due process

22  rights.")

23        Petitioner's jury was instructed on first-degree murder, second-degree murder,

24

25        [9]Petitioner's co-defendants Brown and Taylor also raised a claim on direct appeal that the
    jury instruction on conspiracy was erroneous; however petitioner did not join in this claim.
26  (Resp. Mot. To Dismiss, Ex. E, at 24.)

1 malice, attempt, and conspiracy.  The trial court informed the jury that attempted murder required

2 an express intent to kill.   (CT 583.)   In discussing the charge of attempting to kill Swafford, the

3 instructions explained that:

> An attempt to commit a crime consists of two elements, namely a specific
> intent to commit the crime, and a direct but ineffectual act done towards its
> commission.

6 (CT 583; CALJIC No. 6:00.)  The trial court instructed the jury that "all murder which is

7 perpetrated by any kind of willful deliberate and premeditated killing with express malice

8 aforethought is murder of the first degree."  (CT 587; CALJIC No. 8.20.)[10]   The jury was

9 instructed that:

> When one attempts to kill a certain person, but by mistake or inadvertence kills a
> different person, the crime, if any, so committed is the same as though the person
> originally intended to be killed, had been killed.

12 (CT 591; CALJIC No. 8.65.)  The jury was given several instructions on conspiracy.  Specifically,

13 the jury was instructed that "conspiracy is an agreement between two or more persons with the

14 specific intent to commit the crime of murder....and with the further specific intent to commit the

15 crime."  (CT 584.)   The jury was told that although "a conspiracy is a crime," it was not charged

16 as such in this case.  (CT 584.)   Taken in light of the jury instructions as a whole, the  phrase

17 "with the further specific intent to commit murder" necessarily means with the specific intent to

18 kill.  See Frady, 456 U.S. at 169.   Furthermore, the language of the instructions specifically

19 indicate that in order to find petitioner guilty of attempted murder, the jury must find that

20 petitioner had a specific intent to commit the crime; a finding of guilt on the charge of attempting

21 to murder Swafford necessarily indicates a finding of premeditation and deliberation.

22          Petitioner cannot show that the conspiracy instructions rendered his trial

23 fundamentally unfair and, therefore, has not met his burden of showing that the California

24 Supreme Court's rejection of his claim was based on an objectively unreasonable application of

---

25          [10]The trial court also instructed the jury on second-degree murder (CALJIC No. 8.30) and
26   on Malice (CALJIC No. 8.11).

1  federal law.  Accordingly, the court recommends that this claim be denied.

2     E.     Ineffective Assistance of Counsel

3          Petitioner argues that he was denied effective assistance of counsel.  In order to

4  prevail on his claim of ineffective assistance of counsel, petitioner must show two things, an

5  unreasonable error and prejudice flowing from that error.  See  Strickland v. Washington, 466

6  U.S. 668 (1984).  First, a petitioner must show that, considering all the circumstances, counsel's

7  performance fell below an objective standard of reasonableness.  See  Strickland, 466 U.S. at 688.

8  To this end, petitioner must identify the acts or omissions that are alleged not to have been the

9  result of reasonable professional judgment.  See d. at 690.  The federal court must then determine

10 whether in light of all the circumstances, the identified acts or omissions were outside the wide

11 range of professional competent assistance.  See id.  "We strongly presume that counsel's conduct

12 was within the wide range of reasonable assistance, and that he exercised acceptable professional

13 judgment in all significant decisions made."  Hughes v. Borg, 898 F.2d 695, 702 (9th Cir. 1990)

14 (citing Strickland, 466 U.S. at 689).

15          Second, a petitioner must affirmatively prove prejudice.  See Strickland, 466 U.S.

16 at 693.  Prejudice is found where "there is a reasonable probability that, but for counsel's

17 unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  A

18 reasonable probability is "a probability sufficient to undermine confidence in the outcome."  Id.;

19 see also Williams v. Taylor, 529 U.S. at 391-92; Laboa v. Calderon, 224 F.3d 972, 981 (9th Cir.

20 2000).

21          A reviewing court "need not determine whether counsel's performance was

22 deficient before examining the prejudice suffered by the defendant as a result of the alleged

23 deficiencies . . . .If it is easier to dispose of an ineffectiveness claim on the ground of lack of

24 sufficient prejudice . . . that course should be followed."  Pizzuto v. Arave, 280 F.3d 949, 955 (9th

25 Cir. 2002) (quoting Strickland, 466 U.S. at 697).

26          Petitioner claims that his trial counsel was ineffective because: (1) he "did not

17

1  uphold the contentions of petitioner in his closing argument;" (2)  because his counsel failed to

2  argue that petitioner was intoxicated at the time he committed the crimes; and because Maria

3  Aguilar was a witness who could have brought forth information vital to petitioner's defense, and

4  his counsel failed to interview and subpoena Ms. Aguilar as a witness.

5           1.    The Closing Argument

6           Petitioner argues that his trial counsel should have argued in closing that petitioner

7  was provoked into shooting the victim because petitioner asserted such during his interview with

8  Detective Winton and because this evidence was reflected during trial testimony.  Petitioner also

9  claims this his counsel should have argued that petitioner was intoxicated at the time of the

10  shooting.

11          The record reflects that Swafford came towards him after exiting his car.  (RT

12  1169.)  Petitioner testified that Swafford did not have time to throw a punch before petitioner got

13  out his gun, but petitioner felt that Swafford was going to.  (RT 1169.)  In his statement to

14  Detective Winton, petitioner testified that he was angry with petitioner following a confrontation

15  at Folsom Lake two weeks earlier; petitioner told Detective Winton that Swafford had tried to

16  bully him; that he was mad at Swafford; and that petitioner emptied his clip into Swafford.

17  Additionally, the record indicates that multiple gunshots followed petitioner's first shot, tending

18  to indicate that petitioner had previously conveyed his intent to shoot Swafford to his friends.

19  Given this evidence, petitioner cannot demonstrate that, if his counsel had argued a theory of self-

20  defense during closing argument, that the outcome of his trial would have been different. See

21  Strickland, 466 U.S. at 693. Petitioner cannot demonstrate that he suffered prejudice from

22  counsel's failure to advance a self-defense argument.  See id.

23          Similarly, petitioner cannot show prejudice stemming from his trial counsel's

24  failure to argue during closing arguments that petitioner was intoxicated at the time of the

25  shooting.  Under California law, evidence of voluntary intoxication is admissible as a defense to a

26  specific intent crime, such as the crimes with which petitioner was charged, only to the issue of

1    whether the intoxication affected his actual formation of specific intent to commit the crime.

2    See e.g., People v. Williams, 16 Cal.4th 635, 677 (1997).  Here, petitioner testified during his

3    interview with Detective Winton that he was mad at Swafford due to the incident at Folsom Lake

4    and that was why he shot him.  (CT 1176-1177.)   Petitioner and his friends followed Swafford

5    from the Lounge until he stopped driving.  (RT 604-607.)  Petitioner approached Swafford from

6    behind Swafford's car and began shooting.  (RT 616-625.)  Given this evidence in the record,

7    petitioner cannot establish that had his counsel argued voluntary intoxication, the outcome of the

8    proceeding would have been different.  See Strickland, 466 U.S. at 693.

9                2.      Testimony of Maria Aguilar

10          Petitioner argues that Maria Aguilar's testimony would have supported petitioner's

11    claim of self-defense and that his counsel was deficient in failing to call her as a witness.

12    Specifically, petitioner contends that Ms. Aguilar would have supported petitioner's contention

13    that she attacked Swafford for driving recklessly with her mother in the car; that Swafford hit her,

14    knocking her senseless; and that petitioner, who was like her brother, came forward to deal with

15    Swafford's unreasonable and outrageous conduct.  However, petitioner's own statement to

16    Detective Winton conflicts with this assertion.  Petitioner never mentioned during his interview

17    with the detective that he shot Swafford because Ms. Aguilar was hit.  Instead, petitioner told the

18    detective that he shot Swafford because he was mad at Swafford due to their prior confrontation

19    at Folsom Lake. (RT 1176-1177.)  Petitioner cannot demonstrate that Ms. Aguliar's testimony

20    would have been sufficient to create a reasonable probability of reasonable doubt as to his guilt.

21    See Tinsley v. Borg, 895 F.2d 520, 532 (9th Cir. 1990).

22          The court finds that petitioner's ineffective assistance claims do not provide

23    grounds for habeas relief.

24   IV.     Conclusion

25          In accordance with the above, IT IS RECOMMENDED that petitioner's

26    application for a writ of habeas corpus be denied.

1          These findings and recommendations are submitted to the United States District

2  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within ten days

3  after being served with these findings and recommendations, petitioner may file written

4  objections with the court.  The document should be captioned "Objections to Magistrate Judge's

5  Findings and Recommendations."  Petitioner is advised that failure to file objections within the

6  specified time may waive the right to appeal the District Court's order. See Martinez v. Ylst, 951

7  F.2d 1153 (9th Cir. 1991).

8

9  DATED:   September 13, 2006.

10

11                                _____

12                      **CRAIG M. KELLISON**
                        UNITED STATES MAGISTRATE JUDGE

13

14

15

16

17

18

19

20

21

22

23

24

25

26